UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

UNITED STATES OF AMERICA, :

v. :

JOSHUA MANUEL ALEGRIA, :

Defendant. :

---------------------------------------------------------------X

**MEMORANDUM AND ORDER**
21-CR-564 (WFK)

**WILLIAM F. KUNTZ, II, United States District Judge:**

On June 13, 2024, Joshua Manuel Alegria ("Defendant") pled guilty to one count of conspiracy to commit health care fraud in violation of 18 USC § 1349, to wit, a violation of 18 U.S.C. § 1347, and one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h), to wit, violations of 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(A), and (a)(2)(B)(i). Agreement (the "Plea") ¶ 1, ECF No. 358; Third Superseding Indictment (the "Indictment") ¶¶ 26–27, 30–31, ECF No. 241.[1] The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to ninety-four (94) months' incarceration on each count to run concurrently; two (2) years of supervised release with both the standard and special conditions of supervision; forfeiture of U.S. currency as identified in the Plea; mandatory restitution in accordance with the forthcoming Order of Restitution; and a $200.00 mandatory special assessment.

## I. Background

### A. Factual Background

From April 2017 through March 2022, Defendant conspired with others "to execute a scheme and artifice to defraud one or more health care benefit programs[.]" Presentence Investigation Report (the "PSR") ¶ 1, ECF No. 402. To carry out this scheme, Defendant, Brian Michael Sutton, ("Sutton"), Brycen Kay Millett ("Millett"), Anthony Santamaria ("Santamaria"), Hafizullah Ebady ("Ebady"), Hershel Tsikman ("Tsikman," together with Defendant, Sutton, Millet, Santamaria, and Ebady, "Defendants"), Dela Saidazim ("Saidazim"), and David Gary Bishoff ("Bishoff") "fraudulently bill[ed] private health care benefit programs

[1] Citations are to the docket in *United States v. Ebady, et al.*, 21-CR-564. Page pincites refer to the ECF page numbers assigned to a filing where available, and where no ECF heading is present, to the page numbers listed in the original filing.

(the 'Private Insurers') for fraudulent telemedicine prescriptions and . . . launder[ed] the proceeds of the scheme." *Id.* ¶ 15.

"First, Bishoff and Millet used Call Centers" located around the globe—including the United States and Russia—to call "individuals enrolled in the Private Insurers . . . [and] offer medications at no cost [and] without any medical exams to determine the medical necessity for those medications." *Id.* ¶ 15.

Second, Saidazim and others "recruited licensed physicians and generated fraudulent prescriptions for [the enrolled individuals] under the physicians' National Provider Identifier (NPI) codes" often "without their authorization." *Id.* ¶ 16. These fraudulent prescriptions would be generated regardless of whether or not the enrolled individuals agreed to receive any medications. *See id.* ¶ 15.

Finally, Ebady "locate[d] . . . brick and mortar pharmacies . . . with pre-existing pharmacy board registrations and insurance relationships with the Private Insurers (the 'Scheme Pharmacies')" and "negotiate[d] [their] purchase . . . by straw buyers and direct[ed] their day-to-day operations." *Id.* ¶ 17. Through these efforts, Defendants, Saidazim, and Bishoff were able to "conceal the true ownership and control of the Scheme Pharmacies from the Private Insurers in order to delay discovery of the fraud and maximize their illicit gains before the Private Insurers stopped reimbursing the Scheme Pharmacies." *Id.* The scheme resulted in the scheme participants "own[ing], control[ing], and operat[ing], directly and indirectly, more than 50 Scheme Pharmacies across the United States[.]" *Id.* ¶ 18.

Defendant was responsible for "handling technology assignments for the group." *Id.* ¶ 28. Specifically, he rose in rank from "a call center employee" to "overs[eeing] the development of a custom management and workflow program[,] and generat[ing] and forward[ing] fraudulent

prescriptions to licensed physicians for approval." *Id.* ¶ 10. "In 2016, [Defendant] developed technology systems and processes to automate exporting" the information of "individuals enrolled in the Private Insurers" "into fillable [PDF] prescription forms and e-mailing those [PDF] forms to physicians to sign and return." *Id.* ¶¶ 15, 28. "In 2018, [Defendant] traveled to Russia to train others on how to generate electronic prescriptions to send to doctors." *Id.* ¶ 28. "In 2019, [Defendant] assisted in building a new [Customer Relationship Management] system that tracked more data." *Id.*

Moreover, Defendant "agreed to be a straw owner for pharmacies in Texas." *Id.* "For the first pharmacy, [Defendant] flew to Texas to sign the paperwork and attend the closing on the purchase of the pharmacy."[2] *Id.*

As a result of the scheme, Private Insurers lost hundreds of millions of dollars they paid in fraudulently obtained reimbursements prior to ending their business relationships with the Scheme Pharmacies. *See id.* ¶ 23. The money paid out by the Private Insurers was transferred offshore and concealed by Defendants, Saidazim, and Bishoff before the Private Insurers discovered the fraud. *See id.* Records from the remote billing software show that between April 2017 and March 2022, "the co-conspirators submitted over $1.97 billion in fraudulent claims and were paid over $750 million." Gov't Sent'g Mem. at 5 n.3, ECF No. 548; *see also* Def.'s Sent'g Mem. Suppl. at 1–2, ECF No. 552; *c.f.* PSR ¶ 27.

---

[2] Defense counsel objects, stating "[Defendant] agreed to be an owner of the pharmacy in Texas and, after being an owner on paper, he did nothing as 'owner' or in any other capacity." First Add. to PSR at 1, ECF No. 408. The Government maintains the details of Defendant's trip to Texas "to attend a closing as a straw owner in July 2017[]" are accurate. *Id.* The U.S Probation Office ("Probation") declined to amend this characterization given it "was obtained from the Government and is viewed . . . as accurate." *Id.*

**B. Procedural History**

On June 7, 2021, the United States of America filed a then-sealed complaint against Ebady and Saidazim, alleging their participation in the above-mentioned scheme. ECF No. 2. A similar complaint was filed against Bishoff and Millet on March 7, 2022. ECF No. 1.

On November 8, 2021, a U.S. Grand Jury returned a two-count indictment against Ebady and Saidazim. ECF No. 29. On August 5, 2022, a U.S. Grand Jury returned a two-count superseding indictment (the "First Superseding Indictment") against Ebady, Saidazim, Bishoff, and Millet. ECF No. 92. On February 16, 2023, Saidazim waived indictment and the Government filed a single-count superseding information against her. ECF Nos. 154–55.

On November 3, 2023, a U.S. Grand Jury returned the Indictment against Defendants. *See generally* Indictment. Shortly thereafter, Defendant "was arrested in the Central District of California[.]" PSR ¶ 28. The Indictment charged Defendants with the following: Count One alleged conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349; Count Two alleged health care fraud in violation of 18 U.S.C. § 1347; and Count Three alleged conspiracy to money launder in violation of 18 U.S.C. § 1956(h). *See id.* ¶¶ 26–31. The Indictment also raised criminal forfeiture allegations pertaining to all counts. *See id.* ¶¶ 32–35.

On June 13, 2024, Defendant pled guilty to Counts One and Three of the Indictment. *See* Plea ¶ 1; *see also* Indictment ¶¶ 26–27, 30–31. Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposes a term of 360 months' incarceration or below. *See* Plea ¶ 3. The Government agreed "no criminal charges [would] be brought against [Defendant] for his . . . participation in criminal activity involving healthcare fraud, money laundering, and conspiring to commit the same, all from the period April 2017 through March 2022, and as alleged in the [Indictment][.]" *Id.* ¶ 5(a). Additionally, the Government agreed to dismiss the remaining count of the Indictment with prejudice as to

Defendant at the time of sentencing. *See id.* Finally, the parties consented "to the entry of a forfeiture money judgment in the amount of [$860,500.00][.]" *Id.* ¶ 6.

On February 16, 2023, Saidazim pled guilty to the sole count of the superseding information pursuant to a written plea agreement, charging her with conspiracy to commit health care fraud in violation of 18 U.S.C. § 371. *See* Saidaizim Plea Agreement ¶ 1, ECF No. 153. On December 13, 2023, she was sentenced to time served and $88,000.00 in mandatory restitution. *See* Saidazim Mem. and Ord., ECF No. 315.

On March 31, 2023, Bishoff pled guilty to Count One of the First Superseding Indictment, charging him with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. *See* Bishoff Agreement ¶ 1, ECF No. 172. Bishoff has not yet been scheduled for sentencing.

On February 26, 2024, Millett pled guilty to Counts One and Three of the Indictment. *See* Millet Agreement ¶ 1, ECF No. 341. Millett has not yet been scheduled for sentencing.

On September 27, 2024, Tsikman pled guilty to Count One of the Indictment pursuant to a written plea agreement. *See* Tsikman Plea Agreement ¶ 1, ECF No. 374. On May 4, 2026, he was sentenced to 120 months' incarceration to be followed by two years of supervised release with both standard and special conditions of supervision, and $376,392,569.84 in mandatory restitution. *See* Tsikman Am. Mem. and Ord. at 1, ECF No. 503.

On September 30, 2024, Santamaria pled guilty to Count One of the Indictment pursuant to a written plea agreement. *See* Santamaria Plea Agreement ¶ 1, ECF No. 375. On May 19, 2026, he was sentenced to 120 months' incarceration to be followed by two years of supervised release with both standard and special conditions of supervision, forfeiture of $3,200,000.00, and $521,733,092.88 in mandatory restitution. *See* Santamaria Mem. and Ord. at 1, ECF No. 511.

On October 22, 2024, Ebady pled guilty to Count One of the Indictment pursuant to a written plea agreement. *See* Ebady Plea Agreement ¶ 1, ECF No. 389. On May 6, 2026, Ebady was sentenced to ninety-seven months' incarceration to be followed by two years of supervised release with both standard and special conditions of supervision, forfeiture of $1,820,770.34, and $195,601,140.03 in mandatory restitution. *See* Ebady Am. Mem and Ord. at 1, ECF No. 504.

## II. Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the Guidelines operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state, in open court, the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted

sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

## III. Analysis

### A. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1).

#### 1. *Family and Personal Background*

Defendant was born on May 8, 1991, in Los Angeles, California, to the marital union of his father, Manual Alegria, and mother, Delia Patricia Peralta. PSR ¶ 56. "[Defendant] was primarily raised by his parents under below average economic circumstances[,]" having what "[h]e described [as] a good but independent childhood because his parents worked a lot but were determined to provide for their family." *Id.* ¶ 59. Despite "gr[owing] up poor, [and] eating frozen and processed foods in a one-bedroom apartment[,]" Defendant reports "the . . . home was furnished and clean." *Id.* "When [he] was age 12 or 13, they moved into a two-bedroom apartment and then into a three-bedroom townhouse." *Id.* However, Defendant also recalls "overhear[ing] his parents talking about" filing for bankruptcy around this period. *Id.*

Defendant stated sometimes "[his] father was not around when [Defendant] was growing up because he worked all day and then drank heavily at night." *Id.* ¶ 60. However, "his mother became involved in the church[]" when Defendant was fourteen years of age, and attributes the church as "help[ing] [his] father stop driving heavily" when his father later "became an active Christian." *Id.* Specifically, "[h]is father stopped drinking completely" when Defendant was seventeen years of age. *Id.* In 2017, Defendant's "father passed away . . . at the age of 50[] from

a heart attack." *Id.* ¶ 56. His "father was employed in school maintenance until he became sick[,]" and "shared a decent relationship" with Defendant "as they [both] grew older[.]" *Id.*

Defendant also shares a good relationship with his mother who is now sixty-three years of age and resides in Granada Hills, California, working as a nanny. *See id.* In August 2024, Defendant's mother was remarried to a man named Efren, whom Defendant "does not have a good relationship" with. *Id.*; *see also* First Add. to PSR at 3, ECF No. 408 (correcting Efren's name). While "[Efren] is unaware of the instant case[,]" Defendant's mother "is aware . . . and remains supportive[.]" PSR ¶ 56.

"[Defendant] has two maternal half-siblings." *Id.* ¶ 58. Marcia Coreas is forty-three years of age, and Hector Alvarado is forty years of age. *See id.* Both siblings "share a good relationship" with Defendant, "are aware of the instant case[,] and remain supportive[.]" *Id.*

On September 17, 2013, Defendant married Cindy Siles. *See id.* ¶ 61. Cindy resides with Defendant as a homemaker who has a "dream of becoming an author of children's books." *Id.* ¶¶ 61–62. The couple "share a strong relationship that has improved over the years[.]" *Id.* ¶ 61. Cindy reports "feeling 'shocked' when she learned of [Defendant]'s arrest." *Id.* ¶ 62. "She described [Defendant] as a sweet, incredible man, who pours his heart into everything that he does, and he loves to help people." *Id.* Cindy "is aware of the instant case and remains supportive of [Defendant][,]" stating—in her view—she "knows he did not commit this crime intentionally and it was not his idea." *Id.* ¶¶ 61–62

The couple have two children. *See id.* ¶ 61. Cindy stated "[Defendant] is very involved in their children's lives, and they equally share the responsibilities of caring for their children whether it is bedtime routines or taking them to their afterschool activities." *Id.* ¶ 62. At the time of sentencing, Defendant shared he only recently informed his children of the instant case

and stated, "if he was to serve a custodial sentence, he wants his children to know the truth, so they do not make the same mistakes as he did." *Id.* ¶ 61. Regardless, Defendant believes "[i]f he was sentenced to a term of imprisonment, it would negatively impact their children"; in relevant part, "[his] wife would be unable to financially provide for herself and their children." *Id.*

In addition to the above, the Court has considered Defendant's letter, as well as the letters from his family and friends which were submitted on his behalf. *See* Def.'s Redacted Sent'g Mem. ("Def.'s Sent'g Mem."), Ex. A, ECF No. 546.

*2.* *Educational and Employment History*

From January 2007 to May 2008, Defendant reported being homeschooled through Options for Use in his sophomore and junior years of high school. *Id.* at 4 n.1.

Defendant later "attended private school for free because his parents were employed by the school[.]" PSR ¶ 59. Specifically, Defendant attended Granada Hills Charter High School in Granada Hills, California. *Id.* ¶ 71. "[He] stopped attending because school was too hard for him, and he had an Individualized Education Program . . . due to suffering from attention deficit hyperactivity disorder[.]"[3] *Id.*

From 2010 to 2014, "[Defendant] attended Los Angeles Mission College in Sylmar, California[.]" *Id.*

Defendant's first record of employment was "as an After School Care Supervisor for Pin[e]crest School District in Granada Hills, California," between 2007 and 2009. *Id.* ¶ 75. Defendant reported working part-time, earning approximately $120.00 per week. *See id.* He reports departing from this role "in search for better opportunities." *See id.*

[3] Separately, Defendant reports "he asked to transfer to public school because he was bullied for being poor." PSR ¶ 59. However, Defendant told his parents he wanted to transfer to be in a more diverse environment because he was worried he would "injure his parents by telling them of his classmates [sic] shaming him. Def.'s Sent'g Mem. at 3.

From 2009 to 2010, Defendant worked "as a care giver at an unrecalled assisted living nursing home in Woodland Hill[s], California[.]" *Id.* Defendant reported working part-time, earning approximately $250.00 per week. *See id.* He reports departing from this role to work for Igelia De Restauracion Reseda ("IREST"). *See id.*

From 2010 to 2014, Defendant worked "as a Youth Leader, Web Designer, Band Director, and Graphic Designer for IREST . . . in Reseda, California[.]" *Id.* Defendant reported earning $450.00 per week until "he left the position due to getting married." *Id.*

From 2014 to 2015, Defendant worked "as a Customer Support Specialist for Whole Body Research Group in North Ridge, California[.]" *Id.* Defendant reports earning $700.00 weekly[,]" and "he and his wife received $200[.00] per month in Supplemental Nutrition Assistance Program . . . benefits[]" during this period of his employment. *Id.* He reported departing from this role "in search of better opportunities." *Id.*

From 2015 to 2018, Defendant worked in the Information Technology ("IT") administration department for the Global Marketing Research Group/GZX Group in Woodland Hills, California. *See id.* ¶ 74. Defendant reported earning $4,333.33 in monthly gross income. *See id.* He reports departing from this role "due to the business closing." *Id.*

From 2018 to 2022, Defendant worked in the IT department "as an Administrative Assistant[]" for JCA Management/The Care Group in Beverly Hills, California. *Id.* ¶ 73. Defendant reported earning $13,000.00 in monthly gross income. *See id.* He reports departing from this role "due to the business closing." *Id.*

Defendant has been "employed as the Digital Media Marketing Supervisor[]" for JDB Builders and Riverside Engineering in Riverside, California," since 2022. *Id.* ¶ 72. Defendant reported he earns $6,500.00 in monthly gross income. *See id.* Furthermore, "[h]e disclosed that

if he were to serve a custodial sentence, this employer would consider rehiring him[]" upon completion of his sentence. *Id.*

"[S]ince March 2024, "[h]e has been working toward his certification in Google Search Engineer Optimization . . . and [was] expected to complete his training in approximately February 2025[.]" *Id.* ¶ 70. "[Defendant] has developed skills in web design, digital media, videography, and photography through his involvement in his church." *Id.*

After reviewing Defendant's financial position "and the priority of restitution," the U.S. Probation Office ("Probation") concludes "he appears unable to pay a fine." *Id.* ¶ 80.

3. *Prior Convictions*

Probation reports Defendant has one adult criminal conviction prior to the instant case. *See* PSR ¶¶ 48–54. On July 6, 2012, Probation states Defendant was arrested and charged with driving without a license (Misdemeanor) and at an excessive speed on a highway (Infraction). *See* Second Add. to PSR at 1, ECF No. 412. According to Probation, the Superior Court of California convicted and sentenced Defendant "to three years of probation and an unspecified fine on September 12, 2012." *Id.* "On July 25, 2022, [Defendant] was granted conviction relief[,]"[4] *id.*, as reflected in the Government's exhibit submitted as evidence at sentencing, *see* Gov't Ex. 1.

Defense counsel objects, stating "[Defendant] has never been arrested for any traffic violations, [n]or is there any documentary evidence indicating that an arrest, a conviction, or a sentence occurred." First Add. to PSR at 2; *see also* Def.'s Sent'g Mem. at 18. This objection informs Defendant's Total Adjusted Offense Level recommendation. *See infra* Part I(D).

---

[4] "[A]n individual is granted conviction relief pursuant to California Penal Code § 1203.425, and shall be released from all penalties and disabilities resulting from the offense of which the person has been convicted." Second Add. to PSR at 1 n.1.

At the time of sentencing, the Court agrees Probation has provided the necessary documentary evidence confirming Defendant has been previously convicted.

*4. Physical and Mental Health*

Defendant reports "enjoy[ing] good health" and experiencing "no suicidal ideations, or excessive gambling." PSR ¶¶ 65–66.

However, Defendant does "suffer[] from 'bad anxiety attacks.'" *Id.* ¶ 67. "[S]ince March 2024, [Defendant] has been attending mental health treatment once a week while under the supervision of [the U.S. Pretrial Services Agency for] the Northern District of Georgia []." *Id.* Defendant was only "recommended to attend six individual sessions" but began attending consistently after "express[ing] a desire to continue his therapy sessions." *Id.*

In addition to the above, the Court has considered the letter from Defendant's treating counselor, which addresses his mental health evaluations between February 2024 to January 2026. *See* Def.'s Sent'g Mem., Ex. A.

*5. Substance Abuse*

"[Defendant] first smoked marijuana in 2015 and then [again] in 2020 with friends[]" but otherwise "did not continue smoking marijuana because he" did not like the way it affected his state of mind. PSR ¶ 68. Defendant also used powder cocaine "approximately seven times with friends at parties[]" and "purchased cocaine once[]" between 2018 to 2021. *Id.* He reportedly "stopped using cocaine[,]" because "he did not like how he felt afterwards." *Id.*

Defendant further reports consuming alcohol between 2014 and 2023. *See id.* ¶ 69. "He was a social drinker . . . but stopped because of the instant case and he did not want to be like his father[]" in that regard. *Id.*

*6.* *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense. *See supra* Part I.

**B. The Need for the Sentence Imposed**

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. Defendant participated in a scheme which threatened the integrity of the American health care system. The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

**C. The Kinds of Sentences Available**

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. *See* Plea ¶ 1 (Count One). Defendant faces a maximum term of ten years' incarceration and no minimum term, 18 U.S.C. § 1347, and a maximum fine of $250,000.00 or not more than twice the gross gain or twice the gross loss, 18 U.S.C. § 3571(b), (d).

Defendant also pled guilty to one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h). *See* Plea ¶ 1 (Count Three). Defendant faces a maximum term of twenty years' incarceration and no minimum term, 18 U.S.C. § 1956(a), and a maximum fine of $500,000.00 or twice the value of the property involved in the transaction, whichever is greater, 18 U.S.C. § 1956(a).

In addition to facing terms of incarceration and fines, Defendant faces terms of supervised release and probation for both counts. However, multiple terms of supervised release or probation shall run concurrently to each other. 18 U.S.C. §§ 3564(b), 3624(e). Defendant faces a maximum term of three years of supervised release and no minimum term on each count. 18 U.S.C. §§ 3583(b)(2), 3559(a)(3). If a condition of release is violated, Defendant may be sentenced up to two years of incarceration without credit for pre-release incarceration or time previously served on post-release supervision. 18 U.S.C. § 3583(e).

Defendant is eligible for a term of probation of one to five years for each count. 18 U.S.C. § 3561(c)(1). Unless extraordinary circumstances exist, the Court would have to impose one of the following as a condition of probation: a fine, restitution, or period of community service. 18 U.S.C. § 3563(a)(2).

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

Section 3D1.2 of the U.S. Sentencing Guidelines (the "Sentencing Guidelines," "Guidelines," or "U.S.S.G.") provides rules for grouping closely related offenses in a multiple-count case. Pursuant to U.S.S.G. § 3D1.2(c), Counts One and Three of the Indictment—to which

Defendant has pled guilty—are grouped together because the laundered funds of Count Three were derived from the underlying offense charged in Count One. *See* PSR ¶ 36 n.2 (citing U.S.S.G. § 2S1.1 Application Note 6); Gov't Sent'g Mem. at 5; Def.'s Sent'g Mem. at 17. Accordingly, "the offense level applicable to the grouped counts is the offense level for the most serious of the counts comprising the group[,]" PSR ¶ 36 n.2 (citing U.S.S.G. § 3D1.3(a)), i.e., "the highest offense level of the counts in the Group[,]" U.S.S.G. § 3D1.3(a).

Here, Count Three is more serious than Count One for the purpose of calculating Defendant's offense level for the grouped offenses. *See* PSR ¶ 36 n.2. The applicable provision of the Guidelines for Count Three's charge of 18 U.S.C. § 1956(h) is U.S.S.G. § 2S1.1, which directs the Court to apply the offense level "for the underlying offense from which the laundered funds were derived" if (1) "[Defendant] committed the underlying offense (or would be accountable for the underlying offense under [U.S.S.G. § 1.B13(a)(1)(A)]"; and (2) "the offense level for that offense can be determined[.]" U.S.S.G. § 2S1.1(a)(1).

The laundered funds in this action were derived from the conspiracy to commit health care fraud, the substantive offense of which is found in § 2B1.1 (covering, *inter alia*, forms of theft). Referencing U.S.S.G. § 2B1.1(a)(1), the parties assert Defendant has a Base Offense Level of 7 because Count Three "has a statutory maximum term of imprisonment of 20 years or more." PSR ¶ 36 (citing U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(1)); Gov't Sent'g Mem. at 5;[5] Def.'s Sent'g Mem. at 17.

The parties have varying opinions as to whether certain adjustments should apply to Defendant. First, the parties agree U.S.S.G. § 2S1.1(b)(2)(B) adds 2 levels because Defendant

[5] The Government seems to erroneously cite U.S.S.G. § 2B1.1(a)(2) rather than U.S.S.G. § 2B1.1(a)(1).

was convicted under 18 U.S.C. § 1956. *See* PSR ¶ 38; Gov't Sent'g Mem. at 5; Def.'s Sent'g Mem. at 18.

Additionally, Probation and the Government agree U.S.S.G. § 2S1.1(b)(3) adds 2 levels because (1) Defendant qualifies for the two-level enhancement pursuant to § 2S1.1(b)(2)(B); and (2) "the offense involved sophisticated laundering[.]" *See* PSR ¶ 39; Gov't Sent'g Mem. at 5. Defendant does not challenge the applicability of this enhancement or otherwise mention it. *See generally* Def.'s Sent'g Mem.

Probation states U.S.S.G. § 2B1.1(b)(1)(O) adds 28 levels because the total loss stemming from Defendant's involvement in the offense—based on the Government's initial estimate—was greater than $250,000,000.00, but less than $550,000,000.00. PSR ¶ 37. However, the Government now "submits that it could prove actual losses of $758,155,594.12[.]" Gov't Sent'g Mem. at 9. Thus, the Government argues U.S.S.G. § 2B1.1(b)(1)(P) adds 30 levels because the total loss stemming from Defendant's involvement in the offense is greater than $550,000.00. *See id.* at 5.

Defendant originally agreed with Probation, adding 28 levels in his Guidelines calculation, Def.'s Sent'g Mem. at 17, but later stated "[he] does not challenge" the actual loss amount calculated by the Government as "[h]e was never in [the] position to possess that knowledge." Def.'s Sent'g Mem. Suppl. at 2.

Defendant also includes a purported two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(B), but the Guidelines actually provides for a four-level enhancement if the offense "resulted in substantial financial hardship to five or more victims[.]" Def.'s Sent'g Mem. at 17 (citing U.S.S.G. § 2B1.1(b)(2)(B). Neither Probation nor the Government include or mention this enhancement. *See generally* PSR; Gov't Sent'g Mem.

With respect to mitigating factors, all parties agree a three-level reduction should apply for Defendant's timely acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b). *See* PSR ¶¶ 45–46; Gov't Sent'g Mem. at 5; Def.'s Sent'g Mem. at 18.

Additionally, Defendant asserts a two-level reduction should apply because he is a Zero-Point Offender as prescribed by U.S.S.G. § 4C1.1. *See* Def.'s Sent'g Mem. at 18; *see also* First Add. to PSR at 3 (Defense Counsel argues that, because Paragraph 49 should not receive criminal history points, "[Defendant] should be given the two-level reduction for being a Zero-Point Offender.").

Probation and the Government disagree. *See* Second Add. to PSR at 1; Gov't Sent'g Mem. at 7. Although Probation acknowledges Defendant's receipt of "conviction relief pursuant to California Penal Code § 1203.425," Second Add. to PSR at 1 n.1, the Sentencing Guidelines Specialist of the U.S. Probation Office for the Eastern District of California said "this conviction receives criminal history points as conviction relief differs from a motion requesting the conviction be vacated or invalidated as defined in U.S.S.G. § 4A1.2, Application Note 6[,]" *id.* at 1. "The [G]overnment relies upon Probation's finding[,]" agreeing "[Defendant] receives a single criminal history point and does not meet the criteria to receive an adjustment for certain zero-point offenders." Gov't Sent'g Mem. at 7 (citing U.S.S.G. §§ 4A1.1, 4A1.2(c), 4C1.1(a)(1)).

Nevertheless, all parties agree Defendant's Criminal History Category is I whether he has or does not have one criminal history point. PSR ¶¶ 48–54; Gov't Sent'g Mem. at 5; Def.'s Sent'g Mem. at 18.

Defendant also initially argued his "role in the scheme was minimal and that he should be afforded a 4-level mitigating role adjustment" pursuant to U.S.S.G. § 3B1.2(a). First Add. to

PSR at 1. Probation and the Government disagree. *See id.* However, neither Defendant's sentencing memorandum or supplement raise this point again nor include the mitigating role adjustment in his calculations. *See generally* Def.'s Sent'g Mem.; Def.'s Sent'g Mem. Suppl.

Because the parties disagree regarding which enhancements and mitigating factors apply to Defendant, their calculations of the applicable Guidelines range differ. Probation and Defendant (after conceding the applicable loss amount), calculate a Total Adjusted Offense Level of 36 which, combined with a Criminal History Category of I, results in a Guidelines range of 188 to 235 months' incarceration pursuant to the Sentencing Guidelines Table. *See* U.S.S.G. § 5A; PSR ¶ 82; Def.'s Sent'g Mem. Suppl. at 1–2. The Government calculates a Total Adjusted Offense Level of 38 which, combined with a Criminal History Category of I, results in a Guidelines range of 235 to 293 months' incarceration. *See* U.S.S.G. § 5A; Gov't Sent'g Mem. at 5.

However, the parties failed to apply the specific characteristics found in U.S.S.G. § 2B1.1 when calculating Defendant's Base Offense Level under U.S.S.G. § 2S1.1(a)(1). After applying the specific characteristics found at U.S.S.G. § 2B1.1(b)(1)(P), (b)(2)(A)(i) and (b)(10)(A)-(C), the Court finds Defendant's Base Offense Level is 41. Thus, the Court calculates a Total Adjusted Offense Level of 42 which, combined with a Criminal History Category of I, results in a Guidelines range of 360 months to Life incarceration. *See* U.S.S.G. § 5A.

All Guidelines ranges are subject to a ten-year statutory maximum for Count One pursuant to 18 U.S.C. § 1347, and a twenty-year statutory maximum for Count Three pursuant to 18 U.S.C. § 1956(a).

The Court appreciates the sentencing arguments raised by all parties and has seriously considered each in turn.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

This Court appreciates and seriously considered the policy statements raised by the parties. Finding no other pertinent policy statements on its own, the Court proceeds to the next § 3553(a) factor.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6).

Both the Government and defense counsel have acknowledged Defendant's co-conspirators "were more culpable tha[n] [Defendant] given their comparative roles in the scheme." Gov't Sent'g Mem. at 8–9; *see generally* Def.'s Sent'g Mem. Suppl. Otherwise, the parties have not raised any further arguments regarding unwarranted sentencing disparities in this case. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Pursuant to the Plea, Defendant agreed to mandatory restitution "in the full amount of each victim's losses as determined by the Court." Plea ¶ 1 (citing 18 U.S.C. §§ 3663A, 3664). On September 18, 2026, the Government filed a proposed Order of Restitution in the amount of $758,155,594.12. *See* ECF No. 551. Given no objection from Defendant at the time of

sentencing, the Court will issue a final Order of Restitution in accordance with the Government's proposal.

**IV. Conclusion**

For the reasons set forth above, the Court sentences Defendant to ninety-four (94) months' incarceration on each count to run concurrently; two (2) years of supervised release with both the standard and special conditions of supervision; forfeiture of U.S. currency as identified in the Plea, filed on June 13, 2024; mandatory restitution as set forth in the forthcoming Order of Restitution; and a $200.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a). The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the PSR and addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

**SO ORDERED.**

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: September 25, 2026
Brooklyn, New York